Good morning, Your Honors. May it please the Court, I'm Donald Ray representing Mr. Pellicano. I think that, quite honestly, this is a fairly unique case. We have a situation in which it begins with a search warrant which is issued seeking evidence of something which is not a federal crime. The warrant is extraordinarily overbroad. As a result of the execution of that warrant, evidence is seized and the defendant winds up in the primary conviction against him being Now the first, I'm sorry I have some bronchitis, I'm having a little difficulty. The federal crime in this case is conspiracy to extort, am I right? As far as the search warrant is concerned, they're looking for evidence of extortion, correct. Conspiracy to extort. Presumably that's included within it, yes. Well, the other co-defendant, not in this case, but the other participant, Mr. Proctor. Proctor, excuse me, thanks for the name, was in fact indicted for extortion. And there's not much doubt that there was sufficient showing that there was at least an indictment for extortion with a sufficient showing of relevant facts to put him in that category, was that right? Actually, that case was ultimately dismissed by the government after their review of Scheidler. They realized that they could not possibly make one of the elements of the offense, which is the element that was set out in Pinaro as being, in fact, the jurisdictional element. But at the time of this search warrant, Proctor was still under indictment, was he not? No. In other words, they received information from an undercover operation directed at Proctor. Based upon that information, they obtained this search warrant. Proctor was indicted. Right. Then Scheidler came down. First came the warrant. Yes. Then the indictment. Yes. And then the dismissal. Yes. And it was dismissed. I gather your position is it was dismissed for the same reason you say that the warrant's invalid. Yes. And I don't know that they actually gave a reason for dismissing it. But, in fact, it came up during the course of the argument below that our position was that, obviously, Proctor would have to be dismissed because there was not a sufficient showing of that missing element. The government's position is kind of interesting. I mean, I think very clearly this warrant did not show probable cause because that element was missing. The government in the district court assumed that the element was required. When the district court then found there was probable cause, for whatever reason it did, which I think is obviously error, the government then jumped on the bandwagon and said, well, we agree with you, there is probable cause. The problem is that after Scheidler, I think the government even concedes that there is not probable cause. And they clearly concede that that element is necessary because they dismissed that Proctor case. But before Scheidler was decided, Pinero had been decided. So in this circuit, there is no doubt, the language of Pinero is very clear, that that was an element of the offense. And, in fact, it wasn't just an aside from Pinero. When Pinero decided that, it went through the history of the statute to some degree and actually quoted some law review articles with regard to that issue. So in this circuit, there was absolutely no doubt whatsoever that at the time that this warrant issued, Pinero had been decided a year and a half to two years before. There was a specific element which was required which could not have possibly been made out under the facts regarding the Anita Bush case. The problem that I have with your analysis of Pinero is that prior to that passage which you quote in your brief, there is the sentence that the four conspirators, now this is in Pinero, sought not only to put Gutzstein out of business, but actually to get his business interests for themselves. So there is the showing of the obtaining. Well, I have no doubt that there was a showing of obtaining in virtually every case that the government points to as being an extortion case, particularly following Pinero. But there is also no doubt that the language that Pinero used was unequivocal. The statute requires the obtaining element to be involved. And as I said, and I know this Court saw Pinero, when Pinero was decided, it simply was not a decision which was parroting the history of the case. There actually was reference to the history of the statute, as there later was in Scheidler, and there was reference to law review articles discussing this particular element. So this wasn't just an aside or dictum in the case. This was a specific analysis of that particular statute, and the obtaining element as being a required element of the statute. True with respect to extortion, but what about conspiracy? Well, I don't – if you have a substantive crime which has a particular element, then the conspiracy has to absorb those elements in order to be a valid conspiracy. And so even if one were to look at this as a conspiracy – as a warrant seeking evidence of a conspiracy to commit extortion, you still have to have the elements of extortion. And what you have here are the elements potentially of intimidation. But Scheidler makes clear that the statutory history of this particular statute, the legislative history, makes it very clear that intimidation does not fall within the statute unless there is the obtaining element, and the obtaining element is met. So we are left with a very, very unique situation, which is that a warrant was obtained. There clearly was no probable cause because the element was not only missing, it could not have been established under the facts of the Bush investigation. And so there was an element which was clearly missing. That is not only significant with regard to the sufficiency of the warrant itself, but is really critical with regard to the Leon analysis, because as the Court knows, one of the standards for Leon not applying is that it was so absent in probable cause that judicial – that – so absent in probable cause that governmental reliance upon it would be unreasonable. If you have a situation in which the facts could not possibly establish a Federal crime and could not possibly establish Federal jurisdiction, you don't have to do neat weighing of the factors. Reliance upon this judicially or by government investigators was completely  So suppose the Supreme Court's decision had come out the other way. Now, it was after the fact. In fact, it was very close. I think the search warrant here was November 21st. It was November. And the oral argument in that case in Washington was early December. Correct. So the question is identified at that point, known to the government. The government filed an amicus brief, and indeed I think even the Solicitor General appeared at argument and took a position consistent with the position the government was taking here, as I understand it. Suppose the case had come out differently. Would you still be able to make the argument you're making? Actually, I think I probably would because of the following. What happens – you know, we live in a situation where we have circuits. The circuit courts are required to establish the law within their circuits. The lower courts are required to follow the law within their circuits. If there is a – somehow a dispute between the circuits, the proper remedy is to have the Supreme Court decide it. If at some point down the road the Supreme Court decides that, in fact, the Ninth Circuit is incorrect, God forbid they should ever do that, but if they should do that, well, then the law may change and the law would change in the Ninth Circuit with regard to that issue. But at the time that this warrant was issued, the question becomes, was the government responsible in the way it proceeded to obtain this warrant when the law in this circuit was absolutely clear that this was not a Federal crime? So there would not have been probable cause at the time this warrant had issued. And the question, if you're talking about the good faith analysis, it's very difficult for me to see that the government can claim good faith in a situation in which they purposely avoid relying upon Ninth Circuit authority and in their own minds think that they can rely on Seventh Circuit authority because they prefer that Seventh Circuit authority over the Ninth Circuit. Now, as it happens, Shidler agreed with the Ninth Circuit. So that issue doesn't arise. But under the circumstances of this case, if the Court looks at even the cases the government cites with regards to good faith, these are cases where they do everything reasonably possible to ensure that a knowing and informed decision is made by the magistrate. There's an issue of law which is undecided. The affiant goes to the U.S. attorney to seek guidance. The U.S. attorney researches it, finds out that it is undecided, but he feels that they're correct, and they proceed to the magistrate and inform the magistrate. They didn't do that here. Could you imagine if they had actually gone to this magistrate and said, you know what, Pinaro is decisive in the Ninth Circuit. We don't have probable cause, but we can point to a case in the Seventh Circuit. We'd like you to issue the warrant anyway. If they'd given full disclosure to this magistrate, it would have been reprehensible for that magistrate to issue this warrant, knowing that the law in this circuit had been settled in Pinaro. But that's the situation that we find ourselves in. And because of that, we not only have a warrant which was issued without any probable cause, we have a warrant which cannot possibly satisfy the Leon requirements on three bases. One, because belief in probable cause was wholly unreasonable in this case after Pinaro. We have a second basis because this circuit has used the analysis of whether there No thoughtful judge in the Ninth Circuit, being familiar with Pinaro's statement, could have said Pinaro was not the law. Pinaro was the law. To disregard the law in this circuit would be reprehensible, and no thoughtful judge could do that. And do you know whether, on the chronology, it appears that the Proctor indictment actually preceded the execution of the search warrant here. Do you know if there was any effort made by Mr. Proctor as counsel to dismiss the indictment based on Pinaro? I have no idea. I did not represent Mr. Proctor. I know that I sent a letter after Scheidler came down suggesting that that case should be immediately dismissed, and our case should also be dismissed. But I don't know. Did you send anything like that? Or were you aware of it? You may not have been aware of it at all. But did you do anything like that based simply upon Pinaro? Did who? Did you? Did you send such a letter? No. We hadn't even gotten to the point that we had filed our motions in this case at the time that that had happened. By the time that we filed our motions, Scheidler had actually come down. And so what we have is a situation in which the timing may be everything, but it's clear that Pinaro preceded this case by a substantial number of months and almost two years. And what I was saying before is the third issue that makes the Leon principles completely inapplicable is the unbelievable over-breath of this warrant, because they were looking primarily for computer information. And they have a direction in this warrant that they are to look at basically every piece of computer information to determine the precise contents, so that if they were to come across a document or a file which clearly had nothing to do with the matters they were investigating, they were still required under the direction of this warrant to examine those materials to determine the precise contents of the materials. There is no excuse for that. In the context of a paper investigation, that would have been a warrant that told them to read every line, every sentence, every word, every letter within that office, even if they could tell that it had nothing to do with the investigation. Well, I hear you say that. I'm not sure I understand what practically you do. In fact, when there is a search warrant on paper, flip through the paper, and maybe you can figure out more quickly because of the nature of paper, you don't have to decode it or anything. But the warrant itself was pretty specific with regard to what was being sought. The problem raised is what is it you have to look at to figure out whether it's not within the category of being sought? And as a practical matter, how could they more narrowly have defined it? I think very easily, Your Honor, because as an example, one of the things they agents are told in a paper case is they could have told to look to make an examination of the documents, A, sufficient to determine whether it actually fell within those particular categories. As an example, if they were to come across a copy of a medical file that dealt with Mr. Pellicano or his family members, simply looking at that document for a second, you could tell these are medical files and you could flip through them. That's what you would do in a paper case. But if you said in that paper case, regardless of that, even though that's what we're looking for, look at each piece of paper to determine its precise contents. Once you would make that determination, this is a medical file, under this direction you would still be required to look at every single piece of paper and every line to determine the precise contents, which would include everything within that medical file, as it would within a divorce file or letters or any other than numerable cases that Mr. Pellicano was working on having nothing to do with this case. By including that language as a direction to those searching and seizing agents, they transformed what could have been a proper warrant into one that was as broad as could possibly be imagined. Now, they even quote a case, it's a Tenth Circuit case, in which the officer was looking for, on a computer, for certain information and came across some child pornography. And then he started opening files dealing with child pornography. And the Tenth Circuit said, well, he couldn't do that. It was beyond the scope of the warrant. If that had been this warrant, he would have been required, not only allowed to, he would have been required to open each of those child pornography files because this warrant said, regardless of what this material is, examine it to determine its precise contents. And when you have a situation like that, what you're going to have in a case like this is undoubtedly 99.9 percent of the material that they seize, because they seize an incredible volume of material, is going to have nothing to do with this investigation. But despite that, and despite their cursory review, which could have ruled out 99.9 percent of this material, the direction in this warrant was unequivocal. It said, look at it until you determine the precise contents. So, respectfully, I think that the warrant is clearly overbroad. And, again, that has two ramifications. I want to make certain I know what you're referring to. I'm looking at the warrant, and there's a portion of my copy has the exit of record page cut off, but I take it you're familiar with it. Computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. Is that the section you're referring to? And you take that to be an instruction to them. You have no comma in the sentence. Once it all runs together, what they're supposed to do is view their precise contents and determine whether the data falls within the items to be seized as set forth within. Yes. You take that in the paper case, and once they figure it out as medical files, they move on. Isn't it essentially the same thing for the computer data? I've never seen a warrant that told a – I've never seen a valid warrant that told a seizing agent that he should view the precise contents of the materials. What the warrant tells them to do is to search, to examine the materials in some fashion to determine whether they fall within the warrant and then to move on. It doesn't say to examine the precise contents, and that's the language which poses the problems because if these agents, as we must assume, are in fact following the direction of the warrant, then we've got a problem because they have to do more than they're legally entitled to do. And maybe it was an unfortunate choice of words, but those were the words that these agents are armed with when they go in to search this particular office. And so what we have is two problems. One is a warrant that is void ab initio, and we must remember that the materials which form the basis of the instant prosecution were not sought under this warrant. They were seized as plain sight. So if these agents had no right to be in the premises where they were and to be looking for the things that they were looking for because the warrant was invalid, then these items were improperly seized and must be excluded. And secondarily, because of the Leon issue, because the warrant is overbroad, Leon indicates that in a situation regarding an overbroad warrant, Leon is not applicable. I see I have less than three minutes I'd like to reserve if there are no questions at this point. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court. Assistant U.S. Attorney Daniel Saunders for the United States. First, just to clarify the sequence of events, Judge O'Scallion is correct. The Proctor indictment was returned in October of 2002. The Pelicano search warrant was then executed in late November. Scheidler came down in early February. Prior to Scheidler, there was no motion by Mr. Proctor or his counsel to dismiss that Hobbs Act indictment. Prior to Scheidler, there was no communication from Mr. Pelicano or his counsel with respect to the invalidity of the search warrant. It was on the day of Scheidler that I received a letter from Mr. Ray that is discussed in our brief where Mr. Ray said, based on Scheidler, it is now clear that the government's Hobbs Act theory is flawed. And so I would submit that it was not clear by any means prior to Scheidler. You don't even make it clear after Scheidler, do you? I think it is not crystal clear after Scheidler, because I think that Scheidler purported not to overrule certain cases that if you take a very strict reading of Scheidler's holding would appear to be inconsistent, cases like Tropiano from the Second Circuit. And I think it will probably take some later interpretations of Scheidler, some other cases from the circuit courts and perhaps the Supreme Court, to clarify exactly what they meant by receiving. But you said you have to have it transferred to some other party. I believe that is what the Supreme Court said, that there has to be some receipt of that property in some sort of negotiable or transactable form. And it was based on that, Your Honor, that we did dismiss the Proctor indictment. But you don't – your brief doesn't even want to admit that now. You say Scheidler appeared to cast doubt on the government's Hobbs Act theory. Is that what it did? It just appeared to cast doubt? I believe it cast doubt on that theory. Don't you think that it made it clear that the government's theory was invalid, your theory that you don't have to have a third party receive anything? To the extent that, yes, we were dealing with that type of intangible right to operate a business free of threats and fear, yes, Scheidler did make clear that depriving the victim of that property is not sufficient. And the extortionist has to obtain it in some manner. The point that I make about it being unclear is, again, with respect to other cases that didn't seem to require that and would seem to be inconsistent, but that Scheidler reported not to overrule it. It appeared to cast doubt on the government's theory in this case. Yes, Your Honor. Well, this and the Proctor case. In fact, it invalidates the government's theory in this case. If the Court takes the strictest reading of Scheidler and puts aside the other cases that Scheidler purports not to overrule, then, yes, it does invalidate that Hobbs Act theory. But since this was pre-Scheidler, at least the warrant issue was pre-Scheidler. Yes, Your Honor. What is your theory? What is your direct response to the application of Panaro? Isn't Panaro the key in this case? Panaro, I would submit, was not as crystal clear on the issue as defense counsel says it was. And I believe, Your Honor, it was actually on the Panaro panel. Panaro dealt with a very specific factual situation, which was the extortion, the deprivation in that case, the obtaining of a tangible business interest. In that case, it was the use of force and threats to obtain the victim's ownership interests in two businesses. And there was no question there that the defendant had, in fact, obtained that right. And in the amended Panaro opinion, the court discussed that issue of obtaining. At the same time, we had prior Ninth Circuit cases, cases like Zemeck and Holker, which are cited in our brief, which dealt with extortion of intangible rights, specifically as defined in those cases, the right to make business decisions free of threats and fear and coercion. Now, in all of those cases, cases like Zemeck and Holker and in this case, the benefit, some type of financial benefit in the form of increased business from the extortion. But none of those cases discussed the defendant receiving the right to make business decisions free of threats and fear. Scalia. Well, help me sort out the extortion versus the conspiracy. Is the government's position that Pelicano was also an extortionist or he was part of somebody else's conspiracy at the time, again, of the warrant? The target offenses set forth in the warrant were Title 18, Section 371, conspiracy, and Section 1951, Hobbs Act. The conspiracy alleged was a conspiracy to violate the Hobbs Act. The allegation was that there was a conspiracy between Mr. Pelicano, Mr. Proctor, and possibly others to extort from the reporter and the L.A. Times this right, intangible right, to make their business decisions as to which stories they would publish. And under law prior to Shidler, including law from this circuit, Zemeck and Holker specifically, which Panaro did not purport to overrule nor could it have, and which factually are much more on point with this case and that intangible right than Panaro was, that was a perfectly valid theory. It was vetted up through our office. It was vetted through the Department of Justice. It was presented to the Chief Magistrate Judge. In all these cases where we have the questionable warrant, a magistrate judge has decided it. Many of them, they've gone to the U.S. attorney. They've gone high up in the U.S. attorney and gotten approval of the warrant. What Center Arts says is that when you do that and you know there's a problem and you vet it because you know there's a problem, then you have a duty to alert the magistrate to the problem and advise them specifically of it. And then the magistrate will say to you, yes, I understand the legal problem, and I tell you it's okay. Respectfully, Your Honor, it did not appear there was a problem at the time that this warrant was obtained. Why was it vetted all the way up if there was no problem? Well, the vetting all the way up was for a number of reasons, given the potential impact of the case, the potential attorney-client privilege issues that might be involved with respect to a search of a private investigator's office. There are certain approval requirements that we go through when we are dealing with warrants that might present those issues. Not only the warrant. Both the indictment and the warrant. Both were vetted. You describe at great length how you would explore these issues. The Hobbs Act indictment, yes, was vetted through the organized crime section. So that had nothing to do with the attorney or investigator. That's correct, Your Honor. Suppose that and the warrant were discussed seriously at all levels up to the Department of Justice, and then did anyone tell the magistrate that there was a problem and it was vetted and it was discussed and Panaro was a problem? Your Honor, Panaro was not seen as a problem. It was not Panaro that was vetted or discussed. It was not any apparent conflict among the circuits that was discussed. There were routine approval requirements for the organized crime strike force to vet any organized crime indictments through the organized crime and racketeering section in Washington, D.C. That was done here with the Proctor indictment and the Hobbs Act. Was all of these high-powered government lawyers up to the Justice Department? Nobody was aware of Panaro? Nobody flagged Panaro or considered that as any issue. People were aware of Zemeck. People were aware of Holker. Zemeck, I would note, was cited by Justice Stevens in his dissent in Shidler to support his position, showing how the Ninth Circuit was in line with his position. Justice Stevens' dissent, but it's remarkable that nobody in the Justice Department cared about Panaro. I thought it was even worth mentioning. Again, Panaro does not appear to be on point with the factual situation that we have here, which is what does it mean to obtain?  Well, because Panaro talks about the extortionist receiving property. It doesn't deal with what it means to receive that property when the property right at issue is, as it was in Zemeck and Holker, the right to make business decisions without force and coercion. The Second Circuit in Arena addressed what it means to receive that type of intangible right and said one receives it, one obtains it when one controls the disposition of that right, essentially equating deprivation with receipt for that type of intangible  Okay. Apply that to Pelicano. What's the analogy to Pelicano? Analogizing to Pelicano and to Proctor, the theory is that the L.A. Times had its intangible business right to make its decisions as to what stories it would publish. That is its business. That is its stock and trade. To the extent that a newspaper has a property right that goes beyond the copyright in its pages, it is that right to operate its business and to make its editorial decisions. And the allegation was that Proctor and Pelicano sought to obtain that right, sought to take that right from the L.A. Times by using force and threats of fear to control the L.A. Times' decisions, to take control of that intangible right, the L.A. Times' decisions of what stories to publish. That's the same of the extortion that was approved under the Hobbs Act in Zemeck, the same as in Holker, the same as in Arena and Tropiano from the Second Circuit, the same as in Scheidler from the Seventh Circuit, which was a unanimous opinion before it went up to the Supreme Court. It was a theory that under all of those cases that dealt with deprivation of that intangible right to make decisions free of threats, fear, coercion, et cetera, that that theory was patently clear. It was certainly, and I think to focus on the question that we need to discuss with respect to good faith, the question is whether the law was so crystal clear in this circuit that it was objectively unreasonable for the agents in this case to rely on the approval of the prosecutors, to rely on the approval and the probable cause finding of the district's chief magistrate judge. Was it so clear that it was objectively unreasonable that a reasonably well-trained officer would have ignored that? The standard I find in the Center of Arts is that if you know there's a problem, not that it's so outrageously clear that even the Justice Department would understand it, but it's a question, are you aware there's a problem? And then you're supposed to tell the magistrate so he knows what he's doing. And in this case, Your Honor, again, I would submit it. There is no possible problem. Nobody could have thought that Panaro meant anything. Assuming that Panaro was even on the radar screen at the time, which it obviously wasn't for Mr. Ray and wasn't for Justice Stevens and wasn't for others who viewed that. I don't understand what you mean whether it's on the radar screen. When we issue an opinion, doesn't that put it on the radar screen? Yes, Your Honor. But at the same time, there are all these other cases that are also on the radar screen, other cases from the Ninth Circuit that certainly appear and I believe still appear to be more directly on point because they deal with the precise type of property right that was being alleged in this case. Like what? Zemeck was a customer list? Zemeck was a case that dealt with a customer, I believe, a saloon keeper, a tavern keeper. But what was the property right as defined in that case was his right to make business decisions free from threatened destruction and physical harm. Somebody else was trying to get his customers, sir. Somebody else got his customers, but they didn't get his right to make business decisions free of threats of physical violence and harm. Just like in Holker, somebody got a benefit by being named the beneficiary of a life insurance policy, but they didn't get the property right as defined in that case, which was the victim's right to make personal and business decisions free of threats and coercion. Similarly in this case. Mr. Proctor and Mr. Pellicano, if one accepts... The cases which you find so controlling that Ponnaro has is an unrelated case. In each of those cases, people have obtained the property of the other people, the customer lists and the other, the life insurance benefit. And in this case, if one accepts the allegations, Your Honor, Mr. Proctor and Mr. Pellicano were being paid, were being financially compensated, were benefiting for shutting down the L.A. Times story. Were they obtained from the Times money? No, they were being obtained, obtaining it from a third party. Okay. Which, but the... But your basic position is Ponnaro is just not on the radar screen. It has nothing to do with what we're talking about. I would, my position, Your Honor, is that what this Court has to decide is whether Ponnaro... What you did was consistent with Ponnaro. Is that right or not? I don't believe it's inconsistent with Ponnaro. I think Ponnaro left open the question of what it means to receive that type of property right in an intangible setting. And Zemeck and Holker answered that question apparently directly. So Ponnaro was not inconsistent to that extent. You're saying more than that. You're saying that you didn't think Ponnaro was any kind of a problem. It wasn't on the radar screen were your words. Only Zemeck's on the radar screen. And that's why you didn't think there was any reason to tell the magistrate that there was a legal problem. Your Honor, we did not, we were not aware of, when I approved that affidavit, I was not aware of any legal problem with respect to the Hobbs Act theory. I had reviewed Hobbs Act treatises. I had discussed it with Hobbs Act experts in Washington, D.C. All the word that I had gotten and which I passed on to the agent was that this was a solid Hobbs Act theory and that we were fine. The agent accepted that representation, went to the magistrate judge. The magistrate judge found probable cause. Judge Tegresian later on said he would have found probable cause had the warrant been presented to him. The question for good faith is was the agent required to disbelieve all those people who had told him there was probable cause. And Leon makes clear that he's not. That unless the agent is acting in some grossly negligent or objectively unreasonable manner, we don't place those standards on our agents to know the law better than our prosecutors, better than our magistrate judges, better than our solicitor general. There'd never be any problems because most of these cases, the U.S. attorneys involved with the difficult cases. And they come into court, as in Center Arts, and they say, well, it went up through the U.S. attorney. A lot of people considered it. The magistrate considered it. So we would never, we'd always find Leon exception. Certainly a magistrate's always considered it. And by the time it gets to us, a district judge has agreed. And in many of them, they've been approved by the U.S. attorney. What Leon makes clear, though, Your Honor, is that the exclusionary rule is not a personal right of the defendant. It is a deterrent rule that has been created by the courts in order to deter misconduct by agents. And where that rule would not have any deterrent effect because the agents have not done anything wrong, the exclusionary rule has no place. That's the consistent theme of Leon and of every good faith case that's been decided by this circuit and by the Supreme Court. The agents here did nothing wrong. They presented their affidavit. They got approval. They took it to the magistrate. They got approval. They obtained a search warrant. They executed that warrant according to its terms. The warrants in Center Art Gallery had a whole different set of problems. The warrants in that case didn't even set forth the categories of items to be seized or even the crimes that were under investigation. And that was a patently overbroad and deficient warrant. And it was so deficient that ---- That's certainly not what they told us during the oral argument. I wasn't present for that, Your Honor. They indicated that you are and told us exactly what you're saying. Your Honor, I ---- They said, boy, this went to the U.S. attorney. They really considered it. We really thought it was legal. Why would you expect the agent to think it was? Actually, in Center Art Gallery, we've got a footnote that says there was a factual finding by the district court that the agent was, quote, keenly aware that he was riding the outer limits of the Fourth Amendment. I take it there is no finding or anything like that here. There's absolutely no finding. Has there been any ---- There are findings directly to the contrary by the district court. Well, that's about what I was getting to. Has there been any inquiry or was there anything before the district court that spoke to the question of what the agent was aware of at the time? The court's findings, I don't believe, go to the subjective awareness of the agent. It talks about the presentation, the multiple levels of approval, that the agent obtained the warrant from the magistrate judge, that it was executed in accordance with his terms. One instance that can be drawn from the multiple levels of approval is the one that Judge Reinhart suggested, which is it was looked at carefully because everyone was aware that, you know, this is kind of tough. And there's another explanation that can be offered as well, I'm sure, but right now it doesn't appear that there is any factual finding with respect to that question. That's correct. And I would respectfully submit to the court that having been part of the Organized Crime Strike Force for several years, that's actually not the explanation. It's not vetted because everybody thought, oh, there's something potentially troubling here. You may know that, but do we have anything that we can know that based on it? It sounds like the answer is we don't. I think that's correct as far as what is in the record. The reason why it was vetted is not clear from the record. I suppose the court can draw inferences, but there's nothing in the record to support, I would submit,  kind of problem. That is also not supported by any findings in the record. But since we've talked about center art galleries and I realize I only have a couple of minutes left, I would like to address the overbreadth issue. And I'd like to point out, first of all, that, as we pointed out in our brief, there was no computer-seized evidence used against Mr. Pelicano in this case. The evidence in this case was the grenades, the plastic explosives that were found in the safe. The only relevance to the overbreadth is if the warrant is invalid completely and, therefore, the whole search is illegal. That's the only way they would get the overbreadth to affect the property you seized. If it was – but even if the warrant was overbroad with respect to the computer language, this Court's opinions are clear that all that gets suppressed pursuant to an overbroad warrant is the evidence that is seized pursuant to the overbroad portion. And for that, I would cite the court to United States v. Clark, 31F3rd 831 at 836. The court needs to suppress only the items seized pursuant to the overbroad portion of the warrant. Here, there was nothing seized pursuant to the computer search that was used.  Is that a case where there were, like, 13 items and one was overbroad? Is that – Clark, is that that case? No. Clark dealt with – excuse me. The question is – you don't have much time, and I don't want to make you go. Are you saying that there's a case that says if the entire warrant is overbroad that the search could still be valid? No, Your Honor. But I don't believe the defendant is contending that the entire warrant is overbroad. He's contending the computer search language was overbroad, specifically that language that he seizes on with respect to viewing the precise contents of computer files. If the Court were to find that overbroad, which we submit it's clearly not, it's the standard language that's used in every computer search warrant in this district, there would still be nothing to suppress with respect to this case. So your position is it would not invalidate the entire warrant. It would only invalidate a portion of it. That's correct. And there would be nothing to suppress with respect to this case. But I would go further and ask the Court if it does reach the merits of that issue to clearly find this warrant was not overbroad. This is not a Center Art Galleries or Cal-type case where there was no list of items to be seized, no list even of crimes under investigation. I see I'm out of time. May I ask for just another moment or two? Thank you, Your Honor. This warrant set out the offenses under investigation, conspiracy and Hobbs Act. It set out the place to be searched. It set out the categories of items to be seized. It further subdefined those categories as far as types of items in very closed and other such items. No language like that. Very closed, limited language. The problem that Defendant has equivals with this term precise context, as if that somehow required the agents to conduct this microscopic review of every byte, every bit of data on the computer. It doesn't. As the district court found, that language taken in context, as Your Honor read, simply requires the agents or allows the agents to see if the file contains data that is responsive to the warrant. If it does, they can seize it. If it doesn't, they can't. But it's no different from going into a warehouse filled with file cabinets, stacked floor to ceiling with files. They don't have to stop at the file folder label and say, well that deals with somebody else, it's not responsive. They can open that file folder. If they pull out a document and see it's a letter, they can look at the contents of that letter to see if it contains anything that's responsive to the warrant. If it doesn't, they put it back. They can't seize it. If it does, they can. We're simply dealing with file cabinets that are stored in digital space here, as opposed to in a warehouse. But there's no law from this circuit that suggests that the standard is any different. And the precise contents, again, may be viewed under the language in the warrant only for the purpose of determining whether the evidence falls within the scope of the warrant and, therefore, can be seized. This is very different from the Tenth Circuit case in Cary that Mr. Ray referenced. In that case, once the agent found child porn, he, by his own admission, stopped looking for what the warrant authorized him to look for and started looking for child porn. And he was, therefore, conducting a search that was outside the scope of the warrant. That's not what happened in this case. There's no allegation. There's no evidence that the agents conducting that search were looking for anything other than the specific and defined items that the warrant authorized them to seize. Unless the Court has other questions, I'll cede the floor. I'll ask you one question. Yes, Your Honor. This may be difficult for you to assume, but just assume hypothetically that there was no probable cause for an extortion claim because of Pinar. Assume that you agreed that there was none. Would you then agree that there would be none for a conspiracy claim? Conspiracy to commit extortion. I believe I would have to, Your Honor, making that assumption, which, of course, I'm forcing myself into. I said it would be difficult. A conspiracy has to have an object that is a valid Federal crime. And to the extent that the warrant did not state a proper Federal crime that would be the object of that conspiracy, then I think that that element of conspiracy would be missing. The conspiracy might change the identity of who obtains, but somebody's going to have to obtain if you accept the assumption about Pinaro. If we accept the assumption about Pinaro and we believe that Pinaro made Scheidler crystal clear in November, two months before Scheidler made a foregone conclusion in this circuit, then, yes. I said it would be difficult for you to accept. Somebody has to, Your Honor, predict that correctly. Somebody would have to obtain that. Just to complete the circle, Proctor could be the person who would be forecast to be receiving. It doesn't have to be Pelicano. Correct. For the conspiracy, it would only be necessary that some member of the conspiracy receive that right. And, again, whatever that term, receive, means in that context. Thank you. Thanks very much. Thank you, Your Honors. Very briefly, first of all, we do say this warrant was void of initio and overbroad because the overbroad element of this warrant swamps all of the limitations that counsel talks about. And we have problems with the limitations. One of the limitations is to look at the documents to see if it establishes relationships between several people, which has its own problems. But the portion of the warrant which the Court directed itself to previously said, in searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized, as set forth herein. And we quote that at page 22 of our opening brief. And we believe that that just completely swamps any supposed limitations because, regardless of those limitations, they had to view all of the data seized to view its precise contents. Now, the what I'd like to finish up with is a quote from Pinaro because there seems to be some confusion on the government's behalf as to what Pinaro meant or means. But Pinaro, we quote this at pages 8 and 9 of our brief, says, But under the Hobbs Act, extortion, which is a larceny type offense, does not occur when a victim is merely forced to part with property. Rather, there must be an obtaining. Someone, either the extortioner or a third person, must receive the property of which the victim is deprived. And we go on to show that Pinaro cited cases going back to 1958 to substantiate the necessity of this obtaining requirement, including various law review articles. Now, counsel finds great relief in the Zemeck and Holker cases. They're not at odds with Pinaro because, as the court recognizes, in both of those cases, the extortioner did, in fact, receive the property benefit. In Holker, he got the business. In the excuse me, in Zemeck, he got the business. In Holker, he was trying to be made the beneficiary of a life insurance policy. And why isn't it, in this case, that Proctor obtains the intangible property, notwithstanding Pelicano's role? Well, because there is no intangible property to be obtained. What the claim was that Proctor was leaving dead fish on a car so that the reporter wouldn't write an article. There was no property to be obtained by Proctor whatsoever. And so that's why they had to dismiss that case. And that's why this case is so unique. Because of the factual circumstance which the government was investigating, they could not possibly, under any theory, get a piece of property which could be obtained by Proctor or anybody else. Well, what about the significance of this being pre-Shidler? Has that changed the analysis in any way? Not at all, because it is pre-Shidler, but it's post-Pinaro. And Pinaro was very, very specific in its conclusion. And it was simply, if you will, affirmed by the decision in Shidler. Yeah, but the prior sentence, I'm still having trouble with, when it says the four conspirators, this is Pinaro's case, sought not only to put Putstein out of business, but actually to get his business. Yes. Well, that's because it was a valid extortion charge. But with the statement that I quoted from Pinaro talks about the Hobbs Act in general and says specifically the Hobbs Act. But even in Pinaro, that requirement was met. It was met in Pinaro. There's no doubt. It was met in Pinaro. It was met in Holker. It was met in Zinnick. It wasn't met in this case. That's the problem. Because in what this Court was saying in Pinaro was there was an extortion attempt because they wanted to get the property. And in fact, the Hobbs Act specifically requires not only that the person being extorted is deprived of property, but the extortioners or third-party interests get that property. That was very clear. And it happened there. It happened in Pinaro. And so. And that may be one of the things. That's one of the things I've struggled with because Pinaro affirms a conviction. It doesn't reverse. Frankly, that makes it more credible to me for the government to say this doesn't pop up to us as a problem because they don't have a reversal. They don't have something that says you can't do this, out it goes. In Pinaro, you've got a conviction for a Hobbs Act conviction was affirmed. And arguably, whatever else the Court said about what might happen in a case where the defendants had not obtained the property was irrelevant. You know something? I would certainly hope that we don't get to the state where the government is free to say, well, the Ninth Circuit says this is what the law means. But, you know, because they either affirmed or didn't affirm, we're not going to listen to it. I don't know that there could have been any English words chosen by the Court in Pinaro to have made it more clear what they were saying with regard to the elements of the Hobbs Act. And what they said was not inconsistent with Holker. It was not inconsistent with Zinnick. There is a consistent pattern of saying you have to get this property if you want to have a valid extortion charge. It happened in Holker. It happened in Zinnick. It happened in Pinaro. What they're saying is, oh, well, the Court said it had to happen, and it's always happened in valid extortion charges. But, geez, you know what? The Seventh Circuit doesn't say it has to happen, or the Second, whatever it is. Let's just forget the Ninth Circuit and go off on our own following some other circuit. Now, maybe back in the Justice Department they feel free to say forget the Ninth Circuit. But quite honestly, judges in this circuit and prosecutors in this circuit are not allowed to do that. Thank you, Your Honors. Thank you, counsel. The case is arguably submitted. The Court will stand in recess.
judges: Reinhardt, O'scannlain, Clifton